UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

BOBIE GEORGE,

                        Plaintiff,                    Case No. 1:21-cv-391

v.                                                    Honorable Janet T. Neff

HEIDI WASHINGTON et al.,

                        Defendants.
_____/

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. § 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim. The Court will also deny Plaintiff's pending motion.

## Discussion

### I.    Factual allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Ionia Correctional Facility (ICF) in Ionia, Ionia County, Michigan. The events

about which he complains occurred at that facility.   Plaintiff sues MDOC Director Heidi Washington and the following ICF staff:  Warden John Davids; Deputy Warden Lynn Sandborn; Assistant Deputy Wardens C. Traylor and Sabrina Davis; Prisoner Counselors J. Luther and Trent Hengesbach; Health Unit Manager Jody Labarre; Physician's Assistant David Huyge; and First- and Second-Shift Commanders Unknown Parties.

Plaintiff's complaint resembles dozens of others that have been brought in the Western District of Michigan by prisoners with legitimate fears posed by the ongoing COVID-19 pandemic and frustrations with their prisons' responses. Plaintiff alleges that in October 2020, he was housed in a Level II housing unit at ICF.  At that time, Defendant Luther worked in both of ICF's Level II units—Units 6 and 7—which housed approximately 280 prisoners between them. Defendant Luther reported during the week of October 12, 2020, that he had symptoms consistent with a COVID-19 infection.   Upon notifying authorities of his symptoms, Defendant Luther submitted to testing for COVID-19 and did not immediately return to work.  Defendant Luther's test results allegedly returned positive for COVID-19.

Over the three weeks that followed, many staff and most of the Level II prisoners allegedly tested positive for COVID-19.  On October 16, 2020, two corrections officers left ICF because they had been in close contact with Defendant Luther.  Plaintiff alleges, however, that prison officials gave no instructions to the Level II prisoners at that time in response to Defendant Luther's positive results.

On October 19, 2020, ICF staff swabbed all Level II prisoners and sent the samples to Curative Labs to test for COVID-19.   While providing samples for testing, two prisoners allegedly reported to staff that they had experienced symptoms consistent with COVID-19. Plaintiff alleges that ICF officials quarantined those two prisoners and seven prisoners who shared

a housing cubicle with each symptomatic prisoner—16 prisoners in total—in Unit 1.  Plaintiff further alleges that Unit 1 was normally the disciplinary segregation unit.  After temporarily quarantining in Unit 1, all 16 of these prisoners eventually transferred to facilities used to house prisoners with COVID-19.

On the morning of October 21, 2020, test results began returning for ICF prisoners from the October 19 swabs.  Plaintiff alleges that Defendants Labarre and Huyge relayed the test results to Defendants Unknown Parties so that they could proceed in compliance with MDOC policies.  By 8:30AM, ICF officials had allegedly informed eleven prisoners that they had tested positive and transferred them immediately from ICF to MDOC facilities used to house prisoners with COVID-19.  By 9:00PM, ICF staff informed five more prisoners that they too had tested positive for COVID-19 and moved them from Unit 6 to Unit 1—the disciplinary segregation unit.  Plaintiff alleges that on October 22, 2020, ICF health care staff informed approximately 80 more prisoners from Units 6 and 7 that they had tested positive.

Presumably because a large share of the prisoners had tested positive, ICF administration adjusted their strategy.  Prisoners in Unit 6 were instructed that if they tested negative, they would move temporarily to the ICF gymnasium, which had been equipped with beds.  If they tested positive, they would move to Unit 7.  Unit 7 had, therefore, been designated a COVID-19 unit.  All those who tested negative in Unit 7 would be moved to the gymnasium, but those who tested positive would remain in Unit 7.  On the other hand, Unit 6 had been designated as the unit that would eventually house those who had tested negative for COVID-19.  Once all prisoners had been moved from Unit 6, ICF administration planned to clean the unit.  After cleaning, ICF administration allegedly planned to return the prisoners who had tested negative for COVID-19 from the gymnasium to Unit 6.

Plaintiff alleges that later during the day on October 22, 2020, Sergeant Bost (not a party) instructed Plaintiff to move to the gymnasium.  Plaintiff remained in the gymnasium for several hours, but he was then instructed to return to Unit 6.[1]  Plaintiff alleges that Unit 6 "was now designated as a NEGATIVE Covid-19 unit."  (Compl., ECF No. 1, PageID.11.)

On October 23, 2020, ICF staff again directed multiple prisoners to move from Unit 6 to Unit 7 because they had tested positive for COVID-19.  Plaintiff alleges that these prisoners, like him, had been moved first to the gymnasium the day before only to be returned to Unit 6.  ICF staff again informed several more Unit 6 prisoners on October 24, 2020, that they had tested positive for COVID-19 and moved them to Unit 7.  Plaintiff alleges that "[a]ll these results were from the October 19, 2020[,] nasal swab collection."  (*Id.*)

While tests continued to return from the October 19, 2020, specimen collection, ICF nursing staff allegedly took blood samples on October 23, 2020, from the prisoners still on Unit 6, to test whether those prisoners had antibodies to COVID-19.  Several days later, on October 26, 2020, ICF nursing staff allegedly swabbed "all 109 NEGATIVE prisoners housed in the NEGATIVE[-]designated unit"[2] to test them again for COVID-19.  (*Id.*)

The COVID-19 test results from the October 26, 2020, swabs began returning on October 29, 2020.  Plaintiff alleges that on that day, ICF staff first informed seven prisoners that they had tested negative for COVID-19.  Soon thereafter, ICF staff rescinded the direction because

---

[1] The complaint omits whether ICF officials had received Plaintiff's COVID-19 test results when they moved him to the gymnasium or when they moved him back to Unit 6.  Plaintiff alleges that he did not receive the test results from his October 19, 2020, swab until October 29, 2020.  (Compl., ECF No. 1, PageID.13.)  The complaint also fails to specify whether all prisoners from the gymnasium had returned to Unit 6 or whether Unit 6 had been cleaned.

[2] The complaint fails to clearly articulate whether all prisoners from Unit 6 were swabbed, all those prisoners whose previous tests returned negative for COVID-19 were swabbed, or both.

four of the seven prisoners[3] had tested positive.  The three Unit 6 prisoners who moved to the gymnasium were then administered rapid COVID-19 tests.  One of the three prisoners allegedly tested positive and returned to Unit 6.  The other two prisoners remained in the gymnasium.  Later that day, the test results from the October 26, 2020, swab returned negative for another prisoner. That prisoner moved to the gymnasium after clearing a rapid COVID-19 test.

Plaintiff's COVID-19 test results allegedly began returning much later than the other prisoners.  On October 29, 2020, Plaintiff received the results of his October 19, 2020, swab, which showed that he tested negative for the virus.  He received his October 26, 2020, swab results on October 30, 2020.  Those results again reported that Plaintiff had tested negative for COVID-19.

Plaintiff alleges that he realized he was the only prisoner on Unit 6 whose test results had returned negative, but he remained on the unit.  He spoke with other prisoners who confirmed that he had read his test results correctly.  On October 31, 2020, Plaintiff spoke with a corrections officer to inquire why he remained on a unit that, at that point, allegedly housed over 100 prisoners who had tested positive for COVID-19.  The corrections officer telephoned supervisors who allegedly instructed that Plaintiff could remain on Unit 6 or be placed in Unit 1— what had been the disciplinary segregation unit.  Plaintiff alleges that he understood this instruction to mean that he pushed to be moved from Unit 6, he would be issued a misconduct.  Later during the morning of October 31, 2020, ICF nursing staff administered Plaintiff a COVID-19 rapid test, which returned negative.  Plaintiff allegedly asked whether he could be placed in the gymnasium with the other prisoners who had tested negative, but he remained on Unit 6.

---

[3] The complaint is not altogether clear whether there were seven or eight prisoners who had been told that they were negative for COVID-19.  Although Plaintiff alleges that ICF staff informed *seven* Unit 6 prisoners that they had tested negative and lists the names and MDOC identification numbers of those seven prisoners, Plaintiff later states that four of the *eight* were told not to move.

On November 2, 2020, two days after Plaintiff had tested negative, he submitted a grievance. Shortly thereafter, Defendant Labarre summoned Plaintiff to the gymnasium where staff administered Plaintiff a COVID-19 rapid test. Plaintiff tested positive and returned to Unit 6. Plaintiff sent an email to the ICF inspector. Plaintiff alleges that approximately one hour later, health services swabbed his nasal passage. Plaintiff's test results returned two days later, on November 4, 2020, indicating that Plaintiff had tested positive for COVID-19.

Plaintiff seeks injunctive relief, declaratory relief, and damages.

## II.   **Failure to state a claim**

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the

*Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

## III. **Eighth Amendment**

Plaintiff alleges that the Defendants were deliberately indifferent to his health and safety. The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims).

In a case brought by federal prisoners under 28 U.S.C. § 2241, the Sixth Circuit addressed the issue of whether the Bureau of Prisons (BOP) violated the Eighth Amendment rights of medically vulnerable inmates at the Elkton Federal Correctional Institution by failing to adequately protect them from COVID-19 infection. *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020). In the opinion, the Sixth Circuit found that the plaintiffs in *Wilson* had easily satisfied the objective component of an Eighth Amendment claim:

> In assessing the objective prong, we ask whether petitioners have provided evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death. The BOP acknowledges that "[t]he health risks posed by COIVD-19 are significant." CA6 R. 35, Appellant Br., PageID 42. The infection and fatality rates at Elkton have borne out the serious risk of COVID-19, despite the BOP's efforts. The transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing—which places inmates within feet of each other—and the medically-vulnerable subclass's health risks, presents a substantial risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death. Petitioners have put forth sufficient evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

*Id.* at 840.

The Sixth Circuit went on to address the subjective prong of an Eighth Amendment claim, noting that the pertinent question was whether the BOP's actions demonstrated deliberate indifference to the serious risk of harm posed by COVID-19 in the prison.

8

There is no question that the BOP was aware of and understood the potential risk of serious harm to inmates at Elkton through exposure to the COVID-19 virus. As of April 22, fifty-nine inmates and forty-six staff members tested positive for COVID-19, and six inmates had died. "We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). The BOP acknowledged the risk from COVID-19 and implemented a six-phase plan to mitigate the risk of COVID-19 spreading at Elkton.

The key inquiry is whether the BOP "responded reasonably to th[is] risk." *Farmer*, 511 U.S. at 844. The BOP contends that it has acted "assiduously to protect inmates from the risks of COVID-19, to the extent possible." CA6 R. 35, Appellant Br., PageID 42. These actions include

> implement[ing] measures to screen inmates for the virus; isolat[ing] and quarantin[ing] inmates who may have contracted the virus; limit[ing] inmates' movement from their residential areas and otherwise limit[ing] group gatherings; conduct[ing] testing in accordance with CDC guidance; limit[ing] staff and visitors and subject[ing] them to enhanced screening; clean[ing] common areas and giv[ing] inmates disinfectant to clean their cells; provid[ing] inmates continuous access to sinks, water, and soap; educat[ing] staff and inmates about ways to avoid contracting and transmitting the virus; and provid[ing] masks to inmates and various other personal protective equipment to staff.

*Id.* at 42–43.

The BOP argues that these actions show it has responded reasonably to the risk posed by COVID-19 and that the conditions at Elkton cannot be found to violate the Eighth Amendment. We agree.

Here, while the harm imposed by COVID-19 on inmates at Elkton "ultimately [is] not averted," the BOP has "responded reasonably to the risk" and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights. *Farmer*, 511 U.S. at 844. The BOP implemented a six-phase action plan to reduce the risk of COVID-19 spread at Elkton. Before the district court granted the preliminary injunction at issue, the BOP took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, and providing masks. The BOP initially struggled to scale up its testing capacity just before the district court issued the preliminary injunction, but even there the BOP represented that it was on the cusp of expanding testing. The BOP's efforts to expand testing demonstrate the opposite of a disregard of a serious health risk.

*Id.* at 840–41.

In its decision, the Sixth Circuit recognized that other Sixth Circuit decisions have found similar responses by prison officials and medical personnel, such as cleaning cells, quarantining infected inmates, and distributing information about a disease in an effort to prevent spread, to be reasonable. *Id.* at 841 (citing *Wooler v. Hickman Cnty.*, 377 F. App'x 502, 506 (6th Cir. 2010); *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448–49 (6th Cir. 2014); *Harrison v. Ash*, 539 F.3d 510, 519–20 (6th Cir. 2008); *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018)). The *Wilson* Court also noted that other circuits had concluded that similar actions by prison officials demonstrated a reasonable response to the risk posed by COVID-19:

> In *Swain* [*v. Junior*], the Eleventh Circuit granted a stay of a preliminary injunction pending appeal on state inmates' Eighth Amendment claims. 958 F.3d [1081,] [] 1085 [(11th Cir. 2020) (per curiam)]. The Eleventh Circuit held that "the inability to take a positive action likely does not constitute 'a state of mind more blameworthy than negligence,'" and "the evidence supports that [Metro West Detention Center ("MWDC") is] taking the risk of COVID-19 seriously." *Id.* at 1088–90 (citation omitted). In response to the pandemic in early March, MWDC began "cancelling inmate visitation; screening arrestees, inmates, and staff; and advising staff of use of protective equipment and sanitation practices" and, after reviewing further CDC guidance, began "daily temperature screenings of all persons entering Metro West, establish[ed] a 'COVID-19 Incident Command Center and Response Line' to track testing and identify close contacts with the virus, develop[ed] a social hygiene campaign, and mandate[d] that staff and inmates wear protective masks at all times." *Id.* at 1085–86. The Eleventh Circuit held that, because MWDC "adopted extensive safety measures such as increasing screening, providing protective equipment, adopting [physical] distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures," MWDC's actions likely did not amount to deliberate indifference. *Id.* at 1090.
>
> Similarly, the Fifth Circuit granted stays of two preliminary injunctions in *Valentine* [*v. Collier,* 956 F.3d 797 (5th Cir. 2020) (per curiam)] and *Marlowe* [*v. LeBlanc*, No. 20-30276, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) (per curiam)]. In *Valentine*, inmates at Texas's Wallace Pack Unit filed a class action suit against the Texas Department of Criminal Justice ("TDCJ") alleging violations of the Eighth Amendment. 956 F.3d at 799. In response to the COVID-19 pandemic, TDCJ had taken preventative measures such as providing "access to soap, tissues, gloves, [and] masks," implementing "regular cleaning," "quarantin[ing] of new prisoners," and ensuring "[physical] distancing during transport." *Id.* at 802. The Fifth Circuit determined that the district court applied the wrong legal standard by "collaps[ing] the objective and subjective components of the Eighth Amendment inquiry" by "treating inadequate measures as dispositive of the Defendants' mental

state" under the subjective prong and held that "accounting for the protective measures TDCJ has taken" the plaintiffs had not shown deliberate indifference. *Id.* at 802–03.  In *Marlow*e, the Fifth Circuit relied on its reasoning in *Valentine* and again reiterated that there was "little basis for concluding that [the correctional center's] mitigation efforts," which included "providing prisoners with disinfectant spray and two cloth masks[,] . . . limiting the number of prisoners in the infirmary lobby[,] and painting markers on walkways to promote [physical] distancing," were insufficient.  2020 WL 2043425, at *2–3.

*Wilson*, 961 F.3d at 841–42.

After reviewing the cases, the *Wilson* Court held that even if the BOP's response to COVID-19 was inadequate, it took many affirmative actions not only to treat and quarantine inmates who had tested positive, but also to prevent widespread transmission of COVID-19.  The Court held that because the BOP had neither disregarded a known risk nor failed to take steps to address the risk, it did not act with deliberate indifference in violation of the Eighth Amendment. *Id.* at 843–44.

In addition, in *Cameron v. Bouchard,* 818 F. App'x 393 (6th Cir. 2020), the Court relied on *Wilson* to find that pretrial detainees in the Oakland County Jail were unlikely to succeed on the merits of their Eighth and Fourteenth Amendment claims.  The plaintiffs in *Cameron* claimed that jail officials were deliberately indifferent to the substantial risk of harm posed by COVID-19 at the jail.  The district court initially granted a preliminary injunction requiring the defendants to "(1) provide all [j]ail inmates with access to certain protective measures and medical care intended to limit exposure, limit transmission, and/or treat COVID-19, and (2) provide the district court and Plaintiffs' counsel with a list of medically vulnerable inmates within three business days."  *Id.* at 394.  However, following the decision in *Wilson*, the Court granted the defendants' renewed emergency motion to stay the preliminary injunction, finding that the preventative measures taken by the defendants were similar to those taken by officials in *Wilson* and, thus, were a reasonable response to the threat posed by COVID-19 to the plaintiffs.  *Id.* at

395. Subsequently, in an unpublished opinion issued on July 9, 2020, the Sixth Circuit vacated the injunction. *Cameron v. Bouchard*, 815 F. App'x 978 (6th Cir. 2020).

In the instant case, Plaintiff claims that Defendants' handling of the COVID-19 crisis violated his Eighth Amendment rights while he was confined at MBP. The Court notes that the MDOC has taken significant measures to limit the threat posed by COVID-19.[4]  *See* MDOC, *MDOC Response and Information on coronavirus (COVID-19)*, https://medium.com/@Michigan DOC/mdoc-takes-steps-to-prevent-spread-of-coronavirus-covid-19-250f43144337   (last   visited June 8, 2021).[5]   These measures include:

### Information on COVID-19 Vaccinations

Staff COVID-19 Vaccinations began in later Dec. 2020 and employees across the department have now received vaccinations with the help of local county health departments and the Michigan National Guard.

In accordance with MDHHS vaccination strategy, prisoners 65 years and older have previously been offered the vaccine.  Starting on Monday, March 8, facilities will begin offering the vaccine to prisoners who are aged 50 and older with an underlying health condition.

### Personal Protective Equipment, cleaning and mitigation measures

o   Michigan State Industries has produced masks for all prisoners and correctional facility staff to wear.  Each employee and prisoner received three masks each and the masks can be laundered and worn again.  Facility staff are also permitted to bring their own PPE, such as masks, gloves and

---

[4] The Court takes judicial notice of these facts under Rule 201 of the Federal Rules of Evidence.  The accuracy of the source regarding this specific information "cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2); *see also* Paul F. Rothstein, *Federal Rules of Evidence* 49 (3d ed. 2019) (citing *Matthews v. NFL Mgmt. Council*, 688 F.3d 1107 (9th Cir. 2012) (taking judicial notice of statistics on the NFL website that the plaintiff played 13 games in California over 19 years); *Victaulic Co. v. Tieman*, 499 F.3d 227, 236–37 (3d. Cir. 2007), as amended (Nov. 20, 2007) (finding error where a district court took judicial notice of facts stated in "a party's . . . marketing material" on an "unauthenticated" website because marketing materials often lack precise and candid information and the source was not authenticated)).  Moreover, "[t]he court may take judicial notice at *any* stage of the proceeding."  Fed. R. Evid. 201(d) (emphasis added).  Thus, the Court may take judicial notice even at this early juncture because the Court is permitted to take judicial notice *sua sponte*, Fed. R. Evid. 201(c)(1), and "the fact is not subject to reasonable dispute," Fed. R. Evid. 201(b).

[5] Although the page is hosted on Medium.com, the MDOC specifically links to this page from their website as the location where they will provide updates and information.  *See* https://www.michigan.gov/corrections/0,4551,7-119-9741_12798-521973--,00.html (last visited June 8, 2021).

gowns.  Staff are expected to wear their mask during their entire shift and prisoners are expected to also wear their masks at all times, except while eating, sleeping or showering.  Michigan State Industries also manufactured gowns, protective eyewear and protective suits.  Every facility was expected to receive a new order of MSI masks for both prisoners and staff as of late July.  These are made of a lightweight material for use during the summer months.  Prisoners will receive three each and staff will receive three each as well.  FOA and Central Office staff will be receiving new masks as well.

o   All MDOC staff transporting a prisoner on or off grounds are required to be dressed in full personal protective equipment (PPE), which is available for those employees.

o   All facilities have received approval from the regional sanitation officer to use bleach during facility cleaning.  Facilities have enhanced cleaning efforts and cleaning products are available to clean commonly-used areas and phones before and after use.  Cleaning efforts have been doubled at facilities with vulnerable prisoner populations.  We have increased our production of soap and ensured that all prisoner areas and bathrooms have plentiful access to soap.  Soap has been distributed to prisoners and prisoners have been told that if they need more soap they only need to ask.  Additional soap will be provided at no charge.  CDC posters detailing proper hygiene practices have been posted in correctional facilities and have also been recreated digitally so they play on TV screens throughout our facilities.  These are the same posters you will see in your community and throughout State of Michigan office buildings.

o   Movements have been modified to help facilitate social distancing and the number of prisoners attending classes and meals has been reduced so prisoners can be seated farther apart.  Prisoners and staff are frequently reminded of the need for social distancing and prisoners are instructed not to gather in groups on the yard.  Activities such as basketball and weight pit have been suspended to encourage social distancing, as well.  There are also markers and cones set up for med lines and in the chow hall as a visual reference for prisoners on how far apart they should stand.

o   The department has been leading the nation when it comes to consistent testing of the prisoner population.  Following the completion Friday, May 22, [2020,] of testing prisoners at Michigan Reformatory in Ionia for COVID-19, the Michigan Department of Corrections has completed its goal of testing every prisoner in its system.  Testing also continues daily at our facilities.  When prisoners are set to parole, discharge or other such movements, they are tested again and are not moved until the test results return.

o   Staff and visitors can also access information about their facility by signing up for Nixle alerts.  To sign up for Nixle alerts, go to www.michigan.

gov/corrections and select the page for the correctional facility in your area to register via the Nixle Widget, or text the zip code of the facility you would like to receive updates from to 888777.

**Visits and Transfers**

o   Revised In-Person Visits resumed March 26, 2021.  Click Here.

o   During this time, transfers of prisoners or staff between facilities will not be authorized without the approval of the Assistant Deputy Director or higher.

**Quarantine and Care of Sick Prisoners**

o   Facility healthcare staff will meet with prisoners who have presented with symptoms of coronavirus.  The MDOC does not make the diagnosis of the coronavirus.  The department is following the Michigan Department of Health and Human Services protocol.

o   Prisoners who test positive for the virus are isolated from the general population and any prisoners or staff they have had close contact with are identified and notified of the need to quarantine.

o   Prisoners who test positive may be transferred to the department's designated quarantine unit at Carson City Correctional Facility.  This unit is completely separated from the main facility, has limited movement and access to the unit is limited.  Only a small number of designated staff work in the unit in 12-hour shifts to limit the number of people entering.  Those staff members report directly to the unit and do not enter the main correctional facility.  Prisoners transferred to the unit also stay on the unit and do not enter any other areas of the prison.

o   Prisoners who have been identified as having close contact with another prisoner who tests positive, but have not tested positive for the virus themselves, will be isolated from the general population at their facility for the 14-day quarantine period.

o   Co-pays for prisoners who need to be tested for COVID-19 have been waived.

o   Prisoners have been urged to notify healthcare if they are sick or experiencing symptoms of illness so they can be evaluated.  Prisoners who require outside medical attention will be transported to an area hospital for treatment.

o   Prisoners are considered in step-down status when they no longer have symptoms, are no longer considered contagious and have been medically cleared by our chief medical officer.

**Parole Information**

o   The MDOC Parole Board continues to hold parole hearings and is reviewing all eligible cases to determine prisoners who can be safely released at this time.  In addition, the department is holding remote public Parole Board hearings for parolable life sentence and clemency cases.  You can find more information on scheduled hearings and how to participate here.

o   The department continues to review individual cases and the Parole Release Unit is working to process parole releases for prisoners with positive parole decisions as quickly and safely as possible.

o   We are no longer allowing parole representatives to enter correctional facilities for parole hearings as an additional step to limit the potential introduction of illness.  However, individuals designated by a prisoner as a parole representatives should contact the facility where the prisoner is being housed to find out about options to call in for the hearing.

o   The Parole Board is aware that prisoners do not have access to certain programming and the Board is taking that into consideration.  If there are changes in the prisoner's case, the prisoner will be notified directly.

o   We continue to monitor the prisoner population, our parole and probation population and the parole process as this pandemic continues, in order to consider all options to ensure the safety of offenders under our supervision.

o   All of our paroles are done with public safety in mind.  The Parole Board looks at each individual on a case-by-case basis and will only grant a parole if they believe that person will not be a harm to society.

o   All prisoners set to parole must take a COVID-19 test before being released. The MDOC is working to expedite the parole release of those individuals who can safely and legally be released at this time.  There are a number of steps that are included in the parole release process, which now includes testing for COVID-19 to ensure the individual will not pose a risk to loved ones or the community upon release.  As a result, a limited number of parole dates may be changed to accommodate these processes.  If a prisoner tests positive they will not parole until they are cleared by healthcare, which is at least 14 days from the onset of symptoms.  Prisoners who test negative will be paroled as scheduled.

**Staff Measures and Information**

o   The need for social distancing to help prevent the spread of this virus has included asking organizations to have as many people telecommute as possible, and the MDOC is doing that to the extent we can.  Employees should have been authorized to telecommute by their supervisor and supervisors who have questions should contact their leadership.  No employees who have been ordered to telecommute should return to their work site unless authorized to do so by their deputy director or Director Washington.  Employees who are telecommuting should complete required online training during this time.

o   ALL correctional facility employees continue to report to work.  Our facilities need to continue operating as close to normal as possible for the safety of those both outside and inside the institution.  We need to continue to keep those incarcerated engaged and occupied in a productive manner to ensure the stability, safety and security of our facilities.  Thank you to our correctional facility staff for all they do to keep the citizens of our state safe.

o   Anyone entering facilities will be subject to enhanced screening prior to entering.  This includes answering screening questions and having their temperatures taken.  Anyone suspected of having symptoms will not be allowed in the facility.

o   The Michigan Correctional Officers' Training Council has supported the Department's request to extend the period for obtaining necessary college credits to 24 months from date of hire.  Officers who are deficient in their college credits will now have 24 months from their date of hire to complete the required college credits, rather than 18.  This change allows officers extra time during this period of uncertainty.

o   As the state works to limit the spread of the virus, we caution employees not to let fear lead to discriminatory actions against any individuals based on their disability, race or ethnicity.  If you have experienced or witnessed discriminatory harassment or discrimination, we want you to know it will not be tolerated and we strongly encourage you to report it by calling the MDOC Equal Employment Opportunity Office at 1–800–326–4537, 517–335–3654, or by contacting MDOC EEO Officer Toya Williams at 517–335–4125 or williamst8@michigan.gov.

o   The department's corrections officer training academies have resumed with social distancing measures and enhanced cleaning and sanitizing efforts in place.

o   The Department of Health and Human Services issued an emergency public health order on August 19, 2020 requiring COVID-19 testing of all staff at any facilities that have a positive staff or prisoner case.  Employees must

continue to obtain testing weekly until 14 days after the last confirmed positive case at the facility.  Employees can receive testing in the community or utilize the free, on-site testing the MDOC will provide each week the order applies at a facility.

o   The Department of Health and Human Services issued an emergency public health order on February 10, 2021 requiring daily testing of all employees and prisoners at a facility where an outbreak of special concern has been declared for at least 14 days.

**Operational Changes**

o   Corrections Transportation Officers or other department staff will be reassigned to facilities to augment custody staff as determined by Assistant Deputy Directors.

o   No out-of-state business travel will be allowed until further notice.  All in-state business travel should be for essential matters only and precautions, including wearing a mask, should be used if traveling with others in the same vehicle.

o   Most construction projects have been placed on hold.  Each project will be evaluated on a case-by-case basis.

o   Staff are encouraged to use phone calls, email and teleconferencing in place of in-person meetings when possible.  Any necessary in-person meetings should be limited as much as possible and the size of the meeting should be reduced to allow for attendees to stay the recommended 6-foot distance apart.

*Id.*  Further, the Defendant Washington issued a COVID-19 Director's Office Memorandum (DOM) on April 8, 2020, and issued multiple revised DOMs on the subject.  *See* MDOC DOM 2020-30R2 (eff. May 26, 2020) (outlining specific precautions to be taken by staff members, including the use of personal protective equipment and hand sanitizer); MDOC DOM 2020-30R3 (eff. May 27, 2020); MDOC DOM 2020-30R4 (eff. Aug. 10, 2020); MDOC DOM 2020-30R5 (eff. Aug. 25, 2020); MDOC DOM 2020-30R6 (eff. Aug. 27, 2020); MDOC DOM 2020-30R7 (eff. Nov. 5, 2020); MDOC DOM 2020-30R8 (eff. Nov. 24, 2020); DOM 2021-26 (eff. Jan. 1, 2021); DOM 2021-26R (eff. Jan. 12, 2021); DOM 2021-26R2 (eff. Jan. 21, 2021); DOM 2021-

26R3 (eff. Jan. 25, 2021); DOM 2021-26R4 (eff. Mar. 5, 2021); DOM 2021-26R5 (eff. Mar. 19, 2021); DOM 2021-26R6 (eff. Mar. 26, 2021).

Clearly, Defendant Washington and the MDOC have taken extensive steps to address the risk of COVID-19 to inmates statewide.  As noted by the Sixth Circuit in *Wilson*, such actions demonstrate the opposite of a disregard of a serious health risk.  *Wilson*, 961 F.3d at 841.

Moreover, Plaintiff's allegations reveal that ICF Defendants substantially complied with these policies.  Defendant Luther apparently reported his symptoms to ICF or MDOC authorities, which triggered initial safety measures undoubtedly aimed at stemming the spread of COVID-19.  Defendants tested all prisoners, quarantined those prisoners who had experienced COVID-19 symptoms as well as their cubicle-mates, and separated those who had tested positive for COVID-19 from those who had not.  These actions demonstrate that Defendants took affirmative actions aimed at protecting prisoners, including Plaintiff, from the threat posed by COVID-19 transmission.  Because Defendants worked to reduce the risk posed by COVID-19 transmission, they did not act with deliberate indifference.  *See Wilson*, 961 F.3d at 843–44.

Moreover, many of Plaintiff's conclusions are contradicted by his own allegations. To start, although Plaintiff alleges that Unit 6 had been designated a COVID-19 negative unit at the start of the October 2020 ICF outbreak, that allegation is belied by his other assertions.  For example, Plaintiff clearly states that the COVID-19 test results from the October 19, 2020, swabs continued being released for prisoners in Unit 6 through at least October 24, 2020.  He did not receive his results until October 28, 2020.  Those prisoners from Unit 6 who tested negative moved to the gymnasium on the condition that they also passed a rapid test.  Plaintiff's allegations look much more consistent with a strategy that used Unit 6 as a holding area where Level II prisoners

remained while they waited for their COVID-19 test results.  Yet, this is not the only conclusion drawn by Plaintiff that conflicts with his allegations.

Plaintiff's conclusion that, after his test results finally returned, Defendants left him to choose between staying on Unit 6 or facing a misconduct charge is likewise contradicted by his allegations.  Plaintiff alleged that he was told that he could "either stay in Housing Unit 6 with the POSITIVE Covid prisoners or be placed in Housing Unit 1 Segregation."  (Compl., ECF No. 1, PageID.13.)   Although Plaintiff contends that Defendants' reference to "Unit 1" implicitly threatened him with a misconduct charge and placement in segregation, Plaintiff's earlier allegations make clear that ICF had begun using Unit 1 to quarantine prisoners who were suspected of COVID-19 infection and to isolate prisoners who had tested positive.  Therefore, without more, Defendants' references to "Unit 1" cannot fairly suggest that they would issue Plaintiff a misconduct charge if he wanted to move out of Unit 6.

Presumably, Defendants questioned whether Plaintiff had been exposed to COVID-19 while he waited several days longer than other prisoners for his test results.  Plaintiff alleges that Unit 6 housed more than 100 prisoners who had tested positive at that point, and that he was the only prisoner on the unit who remained negative.  Plaintiff asserts that he spoke with several other prisoners—none of whom were negative for COVID-19 according to Plaintiff's allegations—to determine whether he had read his results correctly.  Consequently, moving Plaintiff to the gymnasium may have risked exposing the prisoners there to COVID-19 even if Plaintiff tested negative on a rapid test as he did later that day.  Defendants likely sought a location to house Plaintiff where he could quarantine temporarily, separate from both prisoners who had tested positive and prisoners who had tested negative, and settled on Unit 1.  Plaintiff apparently rejected this offer, believing that Defendants intended to issue him a misconduct charge if he

accepted.  Could Defendants have communicated with Plaintiff better?  Possibly.  However, Defendants' conduct falls far short of demonstrating deliberate indifference to Plaintiff's health and safety.

In short, Plaintiff's conclusions that Defendants "consciously and intentionally exposed Plaintiff" to other prisoners with COVID-19 or that they otherwise failed to protect him (*id.*, PageID.16), are contradicted by his allegations.  Defendants engaged several strategies intended to prevent a widespread outbreak and to protect individual prisoners including Plaintiff. Thus, although the Court is sympathetic to Plaintiff's concerns about the COVID-19 virus, he has failed to allege facts showing that Defendants' handling of the COVID-19 crisis violated his Eighth Amendment rights.  Accordingly, the Court will dismiss his Eighth Amendment claims against them.

## IV.    **Retaliation**

Plaintiff has further alleged that Defendants' offer to move him to Unit 1 constituted retaliation in violation of the First Amendment.  However, for the reasons set forth above, Plaintiff's conclusion that Defendants' offer to move him to Unit 1 implied that they would issue Plaintiff a misconduct charge if he wanted to move out of Unit 6 simply is not supported by Plaintiff's allegations.  Accordingly, the Court will dismiss Plaintiff's First Amendment retaliation claim.

## V.    **Respondeat Superior**

To the extent that Plaintiff alleges that Defendants Washington and Davids violated either the Eighth or First Amendments, he fails to state a § 1983 claim for an additional reason. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th

Cir. 2009).   A claimed constitutional violation must be based upon active unconstitutional behavior.  *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002).   The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act.  *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004).   Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance.  *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).   "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  Plaintiff has failed to allege that Defendants Washington and Davids engaged in any active unconstitutional behavior. Accordingly, he fails to state a claim against them.

## VI.   **Pending Motion**

Plaintiff has also filed a motion asking the Court to order the Clerk to issue a summons in this matter.  (ECF No. 5.)  Plaintiff paid the full $402.00 filing fee to initiate a civil action.  However, when a prisoner files a § 1983 complaint suing government employees, the Court screens the complaint pursuant to 28 U.S.C. § 1915A and 42 U.S.C. § 1997e(c).  Upon completion of this screening, and in light of the Court's dismissal of this action, the Court will deny Plaintiff's motion.

## <u>Conclusion</u>

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. § 1915A(b), and 42 U.S.C. § 1997e(c).  Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee.

This is a dismissal as described by 28 U.S.C. § 1915(g).

An order and judgment consistent with this opinion will be entered.

Dated:   June 15, 2021                                    /s/ Janet T. Neff
                                                         Janet T. Neff
                                                         United States District Judge